UNITED STATES DISTRICT COURT
for the
District of Colorado

|  |  |  |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | Case No.   19-sw-05979-NRN |
| 22740 Hope Dale Avenue, Parker, Colorado 80138, | ) | |
| more fully described in Attachment A, attached hereto, | ) | |
| to include all out-buildings and vehicles located thereon, | ) | |
| and to include the person of David Stephen Gurule and | ) | |
| David Nathanial Gurule at the time of the search warrant | ) | |
| execution. | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, Kristen Draper, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the <u>State and District of Colorado</u> *(identify the person or describe property to be searched and give its location):*

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit
The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

    **X**  evidence of a crime;

    **X**  contraband, fruits of crime, or other items illegally possessed;

    **X**  property designed for use, intended for use, or used in committing a crime;

    ☐  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of   <u>18</u>   U.S.C. §§ <u>2252 and 2252A</u> , and the application is based on these facts:

    **X**  Continued on the attached affidavit, which is incorporated by reference.

    ☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
    under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/  Kristen Draper*
*Applicant's signature*

Kristen Draper, Special Agent, HSI
*Printed name and title*

Sworn to before me and:  ☐ signed in my presence.
                  ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:   <u>10/03/2019</u>

*Judge's signature*

City and state:   <u>Denver, Colorado</u>

Magistrate Judge N. Reid Neureiter
*Printed name and title*

**ATTACHMENT A**

**<u>DESCRIPTION OF LOCATION TO BE SEARCHED</u>**

The Subject Premises is located at 22740 Hope Dale Avenue, Parker, Colorado 80138.  The Subject Premises is more particularly identified as a two-story residence that is blue in color with brick around the front of the three-car garage and white trim around the entire front of the residence.  There is a large window on the second story facing the street and a smaller window to the left of the large window above the garage doors. The front door of the residence is to the right of the garage doors and is set back from the garage.  There is a porch area to the right of the front door and windows facing the street above and to the right side of the door. The numbers "22740" appear on the house.  A large tree in the front yard of the residence obscures much of the porch area from the street. There is a row of windows on the second story of the residence facing the street above the porch.  A photograph of the subject residence is below.  The location consists of the subject residence, surrounding property, and all outbuildings located thereon.  The place to be searched includes the person of David Stephen Gurule and David Nathanial Gurule at the time of the search warrant execution.

1



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

The following items, located within the residence at the Subject Premises, as more fully described in Attachment A, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 18, United States Code, Sections 2252(a)(1), (2), and (4) and 2252A(a)(1), (2), (3), and (5) (hereinafter "Subject Offenses"):

1. Images or visual depictions of child pornography;
2. Records and information containing child erotica, including texts, images and visual depictions of child erotica;
3. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of the Subject Offenses;
4. Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning communications about child pornography or sexual activity with or sexual interest in minors;
5. Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning Internet activity reflecting a sexual interest in minors or child pornography;
6. Any and all information, notes, software, documents, records, or correspondence, in any form and medium pertaining to any minor who is, or appears to be, the subject of any visual depiction of child pornography, child erotica, sexual activity with other minors or adults, or of sexual interest, or that may be helpful in identifying any such minors;
7. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the computer or by other means for the purpose of committing the Subject Offenses;
8. Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning membership in online groups, clubs, or services that provide or make accessible child pornography;
9. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to the Subject Offenses;
10. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to the Subject Offenses;
11. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to occupancy or ownership of the premises and use or ownership of computer equipment found in the premises, or that aid in the identification of persons involved in the Subject Offenses;
12. Credit cards, credit card information, bills and payment records pertaining to violations of the Subject Offenses;
13. Information about usernames or any online accounts or email addresses showing the use of Comcast Cable Communications or the IP address 73.14.203.25;
14. Computer(s), digital storage media, or digital storage devices, any physical object upon which computer data can be recorded, computer hardware, computer software, servers, computer related documentation, computer passwords and data security devices, gaming devices, tablets, flash drives, volatile data, digital communications devices, cellular telephones, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as keyboards, mouse(s), scanners, printers, monitors, electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for

accessing computer storage media that was used to commit or facilitate commissions of the Subject Offenses; and

15. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, COMPUTER) that is called for by this warrant, or that might contain items otherwise called for by this warrant:

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

    b.  evidence of software that may allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the lack of such malicious software;

    d.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    f.  evidence of how and when the COMPUTER was used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    g.  records of or information about Internet Protocol addresses used by the COMPUTER, including IP address 73.14.203.25;

    h.  information about usernames or any online accounts or email addresses used on the COMPUTER,

    i.  evidence indicating the computer user's state of mind as it relates to the crime under investigation, namely crimes involving child exploitation and child pornography;

    j.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    k.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    l.  contextual information necessary to understand the evidence described in this attachment;

    m.  volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer.

    n.  images and visual depictions of child pornography;

    o.  records and information containing child erotica, including texts, images and visual depictions of child erotica;

    p.  any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to the Subject Offenses;

    q.  any and all information, notes, documents, records, or correspondence, in any format or medium, concerning communications about child pornography or sexual activity with or sexual interest in minors; and

    r.  items otherwise described above in paragraphs 1- 14 of this Attachment B.

<u>DEFINITIONS:</u>

16. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or

typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

17. "Child Pornography" is defined in 18 U.S.C. § 2256(8), which includes as any visual depiction of sexually explicit conduct involving the use of a minor; a digital image, computer image, or computer-generated image that is, or is indistinguishable from that of a minor engaged in sexually explicit conduct; or a visual depiction that has been created, adapted, or modified to appear than an identifiable minor is engaging in sexually explicit conduct.

18. "Visual depiction" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

19. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions; this also includes texts or discussions regarding minors engaged in sexual acts or conduct.

20. As used above, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

## AFFIDAVIT

I, Kristen Draper, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so employed since October of 2002. I am currently assigned to the HSI Denver Child Exploitation Task Force. I am a federal law enforcement officer as outlined in Title 18, United States Code, Section 2510(7) and Federal Rules of Criminal Procedure Rule 41(a)(1)(C) who is empowered by law to request search warrants, conduct investigations, and make arrests for offenses enumerated by statute in the United States Code. I have successfully completed the Criminal Investigator Training Program and the HSI Special Agent Training program at the Federal Law Enforcement Training Center in Brunswick, GA, in addition to several other post-academy training programs. As part of my duties, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of Title 18, United States Code, Sections 2251, 2252, and 2252A. I have received training and instruction in the field of investigation of child pornography and have had the opportunity to participate in investigations relating to the sexual exploitation of children. As part of my training and experience, I have reviewed images containing child pornography in a variety of formats (such as digital still images and video images) and media (such as digital storage devices, the Internet, and printed images).

2. This affidavit is submitted in support of an application for a search warrant for the place described in Attachment A (hereinafter "Subject Premises,"), and the computer(s) located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2252(a)(1), (2), and (4) and 2252A(a)(1), (2), (3), and (5).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2252 and 2252A are presently located at the Subject Premises.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## RELEVANT STATUTES

5. This investigation concerns alleged violations of 18 U.S.C. Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors.

6. 18 U.S.C. Sections 2252 and 2252A prohibit a person from knowingly possessing or accessing sexually explicit images (child pornography) with the intent to view them as well as transporting, receiving, distributing or possessing in interstate or foreign commerce, or by using any facility or

means of interstate or foreign commerce, any visual depiction of minors engaging in sexually explicit conduct (child pornography).

## DEFINITIONS

7.   The following definitions apply to this Affidavit and Attachment B to this Affidavit.

8.   "Child Pornography" includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

9.   "Visual depictions" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image See 18 U.S.C. § 2256(5).

10.   "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

11.   "IP Address" means Internet Protocol address, which is a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

12.   "Internet" means a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

13.   In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

## SEIZURE AND SEARCH OF COMPUTERS

14.   As described above and in Attachment B, I submit that if computers or storage media are found at the Subject Premises, there is probable cause to search and seize those items for the reasons stated below. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes

meaningful only upon forensic analysis.  They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

15. For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data.  Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity.  Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed.  Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

16. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

17. Also, again based on my training and experience, wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files.  Computer users typically do not erase or delete this evidence because special software is typically required for that task.  However, it is technically possible to delete this information.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

18. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

19. The monitor and printer are also essential to show the nature and quality of the images or files that the system can produce.  In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional

manuals or other documentation and security devices.  Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

20. The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem and other system components are also used as instrumentalities of the crime to operate the computer to commit offenses involving the sexual exploitation of minors.  Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet or to otherwise commit the crimes described herein.  The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

21. Information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files.  Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

22. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. For example, your Affiant knows from training and experience that persons trading in, receiving, transporting, distributing or possessing images involving the sexual exploitation of children or those interested in the firsthand sexual exploitation of children often communicate with others through correspondence or other documents which could tend to identify the origin and possessor of the images as well as provide evidence of a person's interest in child pornography or child sexual exploitation.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

23. Your Affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.  Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

24. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  Or, a person engaged in

criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

25. Furthermore, because there is probable cause to believe that the computer and its storage devices are all instrumentalities of crimes involving child exploitation, they should all be seized as such.

26. Based upon my knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques, that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment. This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment. These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

27. For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

A. On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

B. On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted);

C. On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

28. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment. This is true because of the following:

A. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on

premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis.  Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

B.   The volume of evidence and time required for an examination.  Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

C.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

D.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

E.   Need to review evidence over time and to maintain entirety of evidence. Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed.  The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past,

your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

29. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site  seizing, imaging and searching as well as off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

30.  Because several people may share the Subject Premises as a residence, it is possible that the Subject Premises will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

31. Your Affiant knows from training and experience that digital storage devices can be very large in capacity, yet very small in physical size.  Additionally, your Affiant knows from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime.  The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs and text documents.  Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

## BACKGROUND REGARDING THE INTERNET AND CHILD EXPLOITATION

32. I have been formally trained in the investigation of crimes involving the sexual exploitation of children.  I also own my own computer, have personal knowledge of the operation of a computer, and have accessed the Internet for numerous years.  Based on this training and knowledge, and the experience of other law enforcement personnel involved in this investigation, I know the following:

33. Child pornographers can produce images using a wireless device such as a cell phone.  Photos can also be made using cameras, then can be transferred onto another device either using wire or wireless technology.  Images can also be uploaded to Internet-based storage commonly referred to as the

"cloud." Hard-copy images can also be scanned into a computer. Via the Internet, connection can be made to literally millions of computers around the world. Child pornography can be transferred quickly and easily via electronic mail or virtually countless other online platforms, communication services, storage services, and applications.

34. A computer's capability to store images in digital form makes it an ideal repository for child pornography and other files related to the sexual abuse and exploitation of children. The digital-storage capacity in devices and in the "cloud" has grown tremendously within the last several years. Thumb drives with a capacity of 32 gigabytes are not uncommon. Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon. Phones with over 100 gigabytes in storage are not uncommon. Devices can store thousands of images and videos at very high resolution. These devices are often internet capable and can not only store, but can transmit images via the internet and can use the devices to store images and documents in internet or "cloud" storage spaces. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

35. With Internet access, a computer user can transport an image file from the Internet or from another user's computer to his own computer, so that the image file is stored in his computer. The process of transporting an image file to one's own computer is called "downloading". The user can then display the image file on his computer screen and can choose to "save" the image on his computer and/or print out a hard copy of the image by using a printer device (such as a laser or inkjet printer). Sometimes the only method to recreate the evidence trail of this behavior is with careful laboratory examination of the computer, modem, printer, and other electronic devices.

36. Your Affiant knows from training and experience that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to obtain child pornography to include credit card bills, telephone bills, correspondence and other identification documents.

37. Your Affiant knows from training and experience that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

## BACKGROUND ON PEER-TO-PEER NETWORKS, SPECIFICALLY, GNUTELLA AND EDONKEY NETWORK

38. I have been formally trained in the investigation of crimes involving the sexual exploitation of children facilitated by the use of Peer-to-peer (P2P) Networks. Based on this training and knowledge, and the experience of other law enforcement personnel involved in this investigation, I know the following:

39. P2P networks like FastTrack, EDonkey, Bittorrent and the Gnutella Networks. The Peer-to-peer (P2P) Networks have become ideal for traders to openly exchange collections and share those collections. The P2P network has provided a way for traders to have what they feel is an open and anonymous distribution and trading network. This network enables trading on a worldwide basis and with upload and download speeds as if the trader was next door.

40. Computers on the EDonkey and Gnutella network have software installed on them that facilitate the trading of images. The software, when installed, allows the user to search for pictures, movies and other digital files by entering text as search terms. Some names of the software used include, but are not limited to, eMule, BearShare, Frostwire, LimeWire, Shareaza, Morpheus, Gnucleus, Phex and other software clients. Those are software programs that interface with the EDonkey and or the Gnutella Network.

41. The EDonkey and Gnutella Networks and other P2P networks are used by individuals to distribute and share child pornography on the Internet. Investigators nationwide use software that interfaces with information publicly available on the file sharing (Gnutella and EDonkey) network as well as other "open source" information available on the Internet. Using that software, I have conducted and continue to conduct investigations on the P2P Gnutella Network.

42. P2P users can find images and movies of child pornography by using search terms. Some examples of search terms that locate files containing child pornography are "PTHC" (which stands for "Pre-Teen Hard Core"), "babyj", "pedo", "kiddie", "underage", and various terms relating to ages such as "10yo", etc. These search terms typically result in the user being presented with a list of files that include movie and image files that when downloaded and viewed contain child pornography. Automated tools can be used to automate the search process for those terms and then used to identify by IP address those offering for trade, files that have those terms in them (as is the case in this affidavit). Those returned lists of IP addresses offering those files for trade can be scanned specifically for digital signatures of known or suspected child pornography by those same automated tools and that the information can be recorded and examined by jurisdictions across the country.

43. Query results presented to the user of the P2P EDonkey and Gnutella Networks allows the user to select a file from the list of files returned during a query, and then receive that file from other users around the world. Often these users can receive the selected movie from numerous sources at once. The software can balance the network load and recover from network failures by accepting pieces of the movie from different users and then reassembling the movie on the local computer. Certain versions of the EDonkey and Gnutella software (such as ShareazaLE in Law Enforcement use) can also be configured to "ignore" or specifically block all but one user's computer from sending the file. This provides a way for the investigator to target a specific computer suspected of containing child pornography.

44. The EDonkey and Gnutella P2P networks client software can only succeed in reassembling the movie from different parts if the parts all come from the exact same movie. In order to accomplish this, the EDonkey and Gnutella networks have a built-in functionality to insure precise file matching. Precise file matching is done through the use of SHA-1 digital signatures on the Gnutella network. The method used by the Gnutella P2P network involves a file encryption method called Secure Hash Algorithm version 1, or more commonly known as SHA-1. SHA-1 or the Secure Hash Algorithm (SHA) version 1, was developed by the National Institute of Standards and Technology (NIST), along with the National Security Agency (NSA). It has been accepted and adopted as the Digital Signature Standard (DSS) as specified within the Secure Hash Standard (SHS) by the United States of America as a Federal Information Processing Standard. A SHA-1 value can be likened (in layman terms) to DNA but it is statistically a more accurate comparison than a DNA comparison. It is in essence, a mathematical fingerprint of a computer file that will remain the same for an unchanged file no matter where the file is found or on which computer the file is located. Files on the EDonkey network are uniquely identified using a MD4 root hash of a MD4 hash list of pre-determined chunks of the file.

This treats files with identical content but different names as the same, and files with different contents but the same name as different.

45. The ed2k hash function is a MD4 root hash of a list of MD4 hashes from the chunks of the file and gives a different result than a simple MD4 hash: The file data is divided into full chunks of 9500 KiB (9728000 bytes or nearly 9.28 MB) plus a remainder chunk, and a separate 128-bit MD4 checksum is computed for each. If the file length is an exact multiple of 9500 KiB, the remainder zero size chunk is still used at the end of the hash list. The ed2k hash is computed by concatenating the MD4 checksums of all the pieces of the file in order, and hashing the resulting sum using MD4. Although, if the file is composed of a single non-full chunk, its MD4 hash is used with no further modifications. This method of hashing allows the recipient to verify that a hash list corresponds to the original ed2k file hash, without the need to have the data blocks.

46. Files located in a user's shared directory are processed by the P2P client software. As part of this processing, a MD4 root hash value is computed for each file in the user's shared directory. The EDonkey network uses MD4 root hash values to improve network efficiency. Users may receive a selected file from numerous sources by accepting segments of the file from multiple users and then reassembling the complete file on the local computer. The client program succeeds in reassembling the file from different sources only if all the segments came from exact copies of the same file. The network uses MD4 root hash values to ensure exact copies of the same file are used during this process. The MD4 (or Message-Digest Algorithm) is a cryptographic hash function developed by Ronald Rives in 1990. The digest length is 128 bits. The mathematical and statistical probability of a collision is less than a collision of the same DNA in humans.

47. Digital files can be processed, and your affiant has done processing of files during testing by this MD4 root hash and SHA-1 process, resulting in a digital signature. By comparing these digital signatures, one can conclude that two files are identical with a precision that greatly exceeds the statistics of DNA testing and matching on humans and can know for a certainty without actually opening the file what it is, based on its digital signature. Accordingly, that kind of certainty can be used to state for probable cause that; a file with a digital signature that matches a digital signature of known child pornography that is found on a computer during an undercover transaction probably has that file and is probably in possession of child pornography (the certainty is much greater in reality than probable cause). Research into the work of many in the computer forensic communities has been unable to locate any documented natural occurrence of two different files having different contents while having the same digital signature.

48. Users attempting to trade files on the Gnutella file-sharing network can place files from their local computer in a shared folder. If that same user then starts the EDonkey or Gnutella software, that local computer could then calculate the digital signature for each file in the shared folder and provide that information to other users wishing to trade files. EDonkey and Gnutella P2P network software clients that connect and share files on the network calculate the SHA-1 value of files in the user's shared folder upon startup of the software. The EDonkey and Gnutella Client Software makes those values available on the network for comparison through the normal communication process while responding to "search term requests" so that multiple persons sharing one movie or file can deliver different pieces of that movie or file to the local software and the local software can ensure a complete and exact copy can be made from the parts.

49. When a user connects to the Gnutella Network those connections are initially made to Ultrapeers. Ultrapeers are the backbone of the Gnutella network. An Ultrapeer handles most of the searching on

the Gnutella traffic.  Users make connections, upload information about the listing of their shared files and associated SHA-1 values of those files and keep active open connections to those ultra-peers.  When a request for a search goes out, the search goes through the ultra-peers.  When a file is found and a request for that file is made the information about the file and the file then comes directly from the IP address that has the file.  The ultra-peers only have the file listing type information and not the actual file.  As a result, there are many open connections to Ultrapeers during a peer-to-peer session.  Ultrapeers do not have the actual files themselves but only serve as indexing pointers so that the requester can then direct his request for the actual file from the IP address that has the file.  During a search request many IP addresses offer to participate in the delivery of the files known or suspected to be child pornography (as in the case at hand).

50. In much the same fashion users on the EDonkey system connect to a server.  Searches are made through the server.  The server responds with what files and MD4 root hashes it knows are out there on connected peers or nodes and tells the searching software of the file.  The file can then be queued up for a download and those connected who have the file respond with their information about the file they have and its digital signature resulting in a list of those IP addresses who are offering to participate in all or part of the file during the attempted download.

51. Your Affiant knows and has been able to confirm from use of the software and from downloads of files containing the same SHA-1 values that files received from different locations with identical SHA-1 values contain the same content.  Each of the files may be named differently but contain the exact same file and content as long as the SHA-1 values were identical for each file.

52. Entering search query terms in the P2P software can result in a list of file names and their associated digital signatures and that investigators could then choose from for download.  By using this type of search, investigators can compare the offered digital signatures with known digital signatures associated with movie or image files known by the investigator or suspected by other investigators to be child pornography.  Once a file with a digital signature of a known or suspected child pornography file is located, the investigator can use the client software to obtain a list of specific IP address where computers are offering that same file.  Those computers are called hosts and are offering to participate in the distribution of the file that contains the identical child pornographic file and are participating in the trade of known images that match known digital signatures of child pornography.  This feature allows investigators to conduct undercover operations that involve images known or suspected to be child pornography and often involve identified child victims.  In summary this feature allows the investigator to identify the IP address of a computer that has connected to the P2P network and contains a file in the shared folder with a digital signature associated with known or suspected child pornography at the time the computer was connected to the EDonkey or Gnutella P2P network.

53. Querying or searching on the EDonkey and Gnutella P2P networks as described above can result in receiving a list of IP addresses identifying locations where a computer has EDonkey or Gnutella P2P sharing software installed.  The client software can be used to identify and locate unique IP addresses sharing individual files with the same SHA-1 values that match the SHA-1 values of known child pornography.  The client software shows and returns lists of IP addresses where those SHA-1 values of known child pornography files have been reported as available for download.

54. Using the software, your Affiant can locate computers that are reported to be in the District of Colorado.  By doing a comparison of the digital signatures associated with the files being shared, I can conclude that a computer, originating from an IP address known or believed to be in the District of Colorado, has either EDonkey or Gnutella P2P network client, or compatible, software installed on

it and that the computer contains specific, known or suspected images of child pornography based on the digital signatures of the files offered for distribution on the computer. Those specific computers freely give me that information when asked as part of the inherent nature of the "file sharing" P2P network.

55. Various P2P client software programs allow a user to interface with other users of the system. The client software allows a user of the EDonkey and Gnutella P2P networks to search for files being voluntarily and openly shared on the network by other users, and that those files were automatically calculated with their digital signatures as a reference and comparison for the EDonkey and Gnutella Network. The various software programs allow the user to ask for a specific file listing of the contents of another user's shared files at a specified IP address on the network, or those files that a user elects to make public and available for other EDonkey or Gnutella Network users to download.

56. Features built into the EDonkey and Gnutella P2P Client software programs to request a file listing of "shared files" from various computers during undercover P2P operations. The command used is commonly called a "browse." This command allows the computer host (a host is a term used to describe a computer connected to the Internet) making the request to "browse" or look through a listing of files by name, file type, quality and digital signatures that the user on the other end has specifically placed or downloaded into a specific folder for sharing with others on the P2P Network. A "browse" command is available to any and all users on the both the EDonkey and Gnutella Network. Users can share or have files in their shared folder available for searches and downloads on the EDonkey and Gnutella Network. Users can also disallow "browsing" of their shared files. Anyone who routinely uses, and downloads files would know they are downloading from other users who have allowed file sharing on their computer as that is the whole concept and reason for installing a P2P client of software. Conversely, they would also know that certain files on their computer are available for download unless they intentionally change the configuration of the client software to disallow those downloads and browsing commands from others on the network. I know that when I use the "browse" command, I am not going onto or into a computer and looking at files but merely making a publicly available request for that computer to send me the file list. When I look at that list it is because the computer on the other end has freely and voluntarily sent it to me and they have set up their computer with software that allows me or anyone in the whole wide world to make that open and public request.

57. Law enforcement investigators assigned to work child exploitation investigations nationwide use EDonkey and Gnutella client software to access the EDonkey and Gnutella Network and work undercover operations to identify IP addresses that share child pornography. Specifically, the software allows agents to display the digital signatures in the file listings returned in both the "browse" functions and the "file query" functions on the EDonkey and Gnutella Network. This same process can be used by anyone accessing the P2P network.

58. Law enforcement investigators across the country use software that facilitates the automated comparison of digital signatures offered to those of digital signatures of known or suspected to be child pornography. The software in use simply compares digital signatures found by the software in the suspects shared folder with digital signatures in a list of known or suspected child pornography held by the undercover operation. The operation described, could conceivably be done by looking at each digital signature value offered and comparing visually known digital signatures values of child pornography. The undercover software merely speeds up the comparison. It also helps facilitate the geographical lookup of IP addresses sharing those files.

59. I conducted my investigation using the Child Protection System ("CPS") suite of tools.  CPS was created by and at the direction law-enforcement.  The CPS servers are now located in Boca Raton, Florida and owned by the Office of the State Attorney, 15th Judicial Circuit, having been previously owned and maintained by the Wyoming Internet Crimes Against Children (ICAC) Task force under the Wyoming Attorney General's Office.  CPS is a law-enforcement maintained database utilized by federal, state and local law enforcement agencies in child exploitation investigations worldwide. CPS maintains a log of IP addresses that have been previously involved in the possession and distribution of child pornography.  I received training from Cary, North Carolina Detective Kevin West, who has used this database and its predecessor for more than 10 years investigating hundreds of cases and being involved in over hundreds of arrests and has verified that the information concerning his actions while using the database had been logged into the database in a timely and accurate manner.  Files are automatically compared to a known set of hash values as contained in the database that evidence child pornography from previous investigations by other law enforcement officers.

60. The data acquired from automated tools and undercover operations, including hash value, IP address offering to participate in distribution of a file, name of the file, date and time it was identified by CPS provided from the suspect computer, are all compiled into a user-friendly interface.  Your Affiant queried CPS for a particular geographic region or jurisdiction – in this case, the District of Colorado. Upon selecting an IP address to investigate, the information available of the servers historically about that IP address is generated and sent by CPS for the investigating law enforcement investigator to review.

61. I know that William Wiltse formerly with the Salem, Oregon Police Department has created automated software applications, named Peer Spectre and Peer Spectre 2.  These programs operate on the P2P networks the same way as I have described above.  By using search terms previously described and in the same manner as any user can do, they search for files of known or suspected child pornography and then record the IP addresses of those computers offering to participate in the distribution of known or suspected child pornography.  They read the publicly available information from computers that are identified as offering child sexual abuse images for distribution. This software reads these reported offers to participate in the sharing of child pornography and reports the time, date, SHA1 value and GUID number (serial number) of the software, and filename for each computer in a consistent and reliable manner to the undercover servers housed in Florida.  Detective West validated this software by running identical search terms through the manual method described above and the automated system using Peer Spectre2 and have confirmed that Peer Spectre2 performs in the same way, with matching results as the previous manual investigative techniques used in this operation to date.  The Peer Spectre programs provide beneficial data to undercover officers by automatically identifying and logging IP addresses that are offering to distribute child pornography. The software is distributed and run by thousands of investigators whose software then contributes to a global database.  Your Affiant has access to those automated logs and can check and see who in and around the District of Colorado is participating in and offering child pornography for distribution on the P2P networks.

62. Likewise TLO LLC has created an additional pieces of software for specific law enforcement data collection called Limecrawler/Limescanner which is a server based program just like Peer Spectre 2 that is used to send search terms out and record, based on returns from IP addresses, those IP addresses offering to participate in the distribution of files that have digital signatures that match known or suspected child pornography.

63. NordicMule is a software tool based on the eMule software program, a publicly available P2P client that operates on the EDonkey network. NordicMule was originally adapted from eMule by the Norway National Criminal Investigative Service for law enforcement purposes. NordicMule was then modified for law enforcement investigations to function within the CPS suite of tools, discussed above. Functionality and features were added to create a software tool that identifies computers offering to share files associated with the exploitation of children on the EDonkey network.

64. NordicMule works by regularly downloading ed2K links (EDonkey magnets) from the CPS servers. Those links are file hashes previously viewed by law enforcement and known to contain depictions of child sexual abuse. As NordicMule receives information from sharing peers about a known file, it attempts to connect and browse that peer. NordicMule identifies what each individual and specific computer is offering for transfer based on IP address. Thus, the information acquired is not from multiple sources, but from specific IP addresses at specific dates and times. All information submitted to the CPS servers is the result of individual peer computers responding to a request from NordicMule. Information that is logged to the CPS servers contains the police officer's license number.

65. NordicMule searches for files of known or suspected child pornography and then records the IP addresses of those computers offering to participate in the distribution of known or suspected child pornography. NordicMule reads the publicly available information from computers that are identified as offering child sexual abuse images for distribution. This software reads these reported offers to participate in the sharing of child pornography and reports the IP address, the time, the date, the ED2K MD4 value, the type of software in use, the GUID number (or serial number) of the software, and the filename for each computer offering in a consistent and reliable manner to the undercover servers housed in Florida. Detective West has validated this software by running identical search terms through manual methods with open source software and the automated system using NordicMule and has confirmed that NordicMule performs in the same way, with matching results as the previous manual investigative techniques used in this operation to date. The automated tools like NordicMule in use in the undercover operation provide beneficial data to undercover officers by automatically identifying and logging IP addresses that are offering to distribute child pornography. The software is distributed and run by thousands of investigators whose software then contributes to a global database. Your affiant has access to those automated logs and can check and see who in and around the District of Colorado is participating in and offering child pornography for distribution on the P2P networks.

66. Through the use of the EDonkey and Gnutella Network, I and other undercover officers around the country have been able to check the host IP addresses sharing the known child pornography by performing a geographical IP lookup through a server set up by the Florida ICAC initiatives. Those servers use an IP geographical lookup through publicly available companies like "MaxMind," located at: www.maxmind.com. The servers run by the Florida ICAC are set up and configured so that they record all the transactions (IP Addresses and associated known or suspected Child Pornography) whenever an agent in any Jurisdiction across the country, or automated tool locates and identifies an IP address that has recently offered child pornography for distribution on the Gnutella Network. Access to use the server is by license and after training in how to correctly use the logging features and in maintaining the importance and veracity of the records that are logged. The server records the transactions and requests through the server made by undercover agents for the geographical lookups from "MaxMind." It logs the digital signatures values being researched, the IP addresses offering it for distribution on the P2P Networks, the date and time, and the information of the officer or agent making the request so that the information can be attributed to a single user of the system and the

14

serial number of the software on the computer called a GUID. The information from that data entered by each agent or officer using the software is then written to a log file on the server. Each file offered for distribution found by an undercover officer or undercover software like the tools described above during an undercover session that matches the digital signature of a known child pornography video or image is recorded and logged on the server housed and hosted by Florida. The file digital signature and corresponding software serial number and IP address of the person sharing the file is presented and information about the check is stored for later sorting and retrieval.

67.  Your Affiant has been able to obtain the records from that server pertaining the District of Colorado. Records on specific IP addresses are obtainable through the undercover operation. Those log files contain the information that has been recorded about the IP addresses and the SHA-1 values of known child pornography that are logged by other undercover agents and officers around the country and logged by the automated processes and programs looking for those sharing known digital signatures of child pornography. They contain information about the child pornography files and the IP addresses that have recently offered them for distribution. Those logs and records found by automated logging software and undercover officers, as well as the locations of the IP addresses as reported by the MaxMind GeoIP lookup as coming from District of Colorado IP addresses, form some of the basis and probable cause for the issuance of this search warrant.

68.  A standard requirement for programmers in the P2P environment is to create an interface system or program (i.e. LimeWire or Bearshare or many others) that uses a Globally Unique Identifier (GUID) in order to ease the traffic on the network and make routing easier. The GUID is a randomized string that is used by most software writers to uniquely identify a peer user depending on the Gnutella client or software. It is essentially a unique serial number for a software installation on a computer and can be used to identify a computer on the P2P network. Most of the major software vendors use this unique number identification system. When a person loads the client software on their computer (such as LimeWire) a unique number is created and assigned to that installation of the software that is unique for that computer and installation. That GUID number is embedded into the programming on the computer and in turns is delivered across the network in certain situations for identification purposes. LimeWire, Frostwire and Bearshare all adhere to those standards.

69.  When P2P Clients, including Shareaza, Limewire, Bearshare, Phex and others are installed on computers there is a unique serial number called a GUID created and stored in a properties files. That number is then used in routing across the network and can be seen by users on the other end who connect to a computer. The Wyoming ICAC undercover system called Fairplay utilizes that number and when possible captures the number and associates that number with IP addresses and the values of the files of child pornography that computer offers. Sometimes depending on the network traffic and individual settings the undercover officer's computer can capture that GUID number and then log it with the accompanying IP address and SHA1 values of the files it was seen sharing.

70.  In the case at hand a computer at the location of the IP address listed in this affidavit (73.14.203.25 using the GUID numberB4F9BED679EF574BAF7BBE623EFE6D16) offered for participation in the distribution files with digital signatures that are known or suspected to contain child pornography. A reasonable investigator with the proper training and experience could infer and conclude from the logs that the computer at the reported IP address recently offered for distribution files with digital signatures of known or suspected child pornography. It could also be inferred with a high degree of certainty that the digital signature and IP address logged were coming from one single computer (based on the same GUID) that was sharing or offering to share those files on the Gnutella Network and the EDonkey network to other users.

71. Cooperating police agencies pool their information to assist in the identification of criminal conduct and to build probable cause to further criminal investigations.  With this pooled information, law enforcement authorities get a better understanding of the global information available about a suspect that resides in their area of jurisdiction. This information is valuable when trying to regionalize a suspect to a certain jurisdiction, given the global scope of the Internet.  Investigators from around the world gather and log information, which can be used by an investigator to build probable cause on one specific case.  This undercover operation is an example of this type of cooperative pool of information.

## INVESTIGATION

72. According to the CPS suite of tools described in above, the suspect IP address 73.14.203.25 (hereafter referred to as "suspect IP address") has been observed in the CPS database 29,379 times between the dates October 9, 2018 and August 29, 2019 advertising and offering to participate in the distribution of files known or suspected to be child pornography.  The suspect IP address has been observed in CPS between the dates October 09, 2018 at 1:35 PM August 29, 2019 at 9:33 PM advertising 29,379 unique files known or suspected to be child pornography.

73. On August 15, 2019, your Affiant specifically programmed undercover software (ShareazaLE) to ask the suspect IP address for a public listing of the files available for sharing offered by the computer at the suspect IP address (your Affiant asked for a "browse").  Your Affiant also programmed the ShareazaLE to specifically request a download to your Affiant's computer from the computer at the suspect IP address of known or suspected child pornography files from the suspect IP address (based on their known hash values) that the suspect IP address had been logged sharing.  Your Affiant began using ShareazaLE on the suspect IP address.  That software is currently used in Peer-to -Peer file sharing investigations to download the files of child pornography.  This software is designed by and for law enforcement and only available to law enforcement officers who have attended the appropriate training.  ShareazaLE is designed to connect directly to one IP address and browse and/or download from one specific peer at a time blocking any swarming from other IP addresses.  ShareazaLE is a peer-to-peer file sharing client similar to other file sharing clients (like LimeWire or Bearshare) on the Gnutella network which are free and available to the public.  Shareaza specifically connects to both the Gnutella and eDonkey networks.

74. Using source code from a free and open source code peer-to-peer client (Shareaza), ShareazaLE was modified for law enforcement to meet the stringent investigative requirements of these cases.  For example, ShareazaLE will only download files from a single source – the target IP (in this case specifically and only suspect IP address), while the public version will download from many sources.  ShareazaLE thus takes much longer to download files because of the single source limitation.  ShareazaLE uses only publicly available P2P options, which follow the programming language (protocols) set forth in the public P2P protocol standards.  No functionality outside of the publicly available protocols is added, thus eliminating any potential private intrusion on the suspect IP's computer or files.  ShareazaLE uses the same code and language that is available to any and all software developers.

75. Upon locating an IP address on the peer-to-peer networks that is evidencing hash values of known images and/or videos of child pornography, the IP address is launched into the Undercover Investigative Software.  An automated function of ShareazaLE will attempt to connect to the IP address when it is observed being "on-line" and send a request to browse (i.e. look at and log the

information about shared files being transmitted and/or shown by that IP) and/or download a file from the shared folder of the computer utilizing that IP address.  If the connection is not made to either browse or download, ShareazaLE automatically continues to attempt to make a connection with the IP address.

76. If a connection is made with the IP address, ShareazaLE will log the connection. It will also log the browse and/or download in the "logs" – the activity associated to IP activity.  Files are then downloaded directly into your Affiant's computer and segregated from any other evidence.  Prior to beginning an investigation ShareazaLE, your Affiant specifically creates a folder structure on the hard drive of her own computer instructing ShareazaLE to the file path of where to store files that are downloaded and logs that are created.  Both the downloaded files themselves as well as logs will be reported in the appropriate folders created for the targeted peer IP address by your Affiant.  The logs identify that a known hash value of child pornography has been located, that the download transfer started, that the transfer is in fact processing, and that the transfer of the file is complete.  The length of time the download process takes depends on the size of the file and speed of the internet/computer of both your Affiant, and the target IP's computer.

77. When a file has successfully completed the download process ShareazaLE notifies your Affiant.  The software, being based on peer-2-peer program design, ensures that files are obtained directly from the target IP address – assuring a single-source download so that any downloaded file comes directly from the suspect IP address.

78. The software directly connected to the computer using the suspect IP address several times between the dates August 15, 2019 and August 27, 2019 and obtained updated file lists from the shared folder. The first browse occurred on August 15, 2019 at 15:08:06 (GMT -06:00).  The computer at the suspect IP address reported that it was running software with the Protocol: Gnutella.  The computer at the suspect IP address reported that it was using a version of the Client Software Shareaza 2.7.9.0 and that the software ID or serial number called its GUID B4F9BED679EF574BAF7BBE623EFE6D16.  The computer reported its IP address as the suspect IP address and it was operating on port 6346.  The software compares hash values of files in the shared folder with hash values of known child pornography files previously identified by other law enforcement officers through their investigations.  If a hash value match indicating suspected child pornography is determined, that file will be flagged as "child notable." During the initial browse it was noted that a listing of 1490 files were received from that computer and that 429 of those files were flagged as child notable. The filenames of most of those flagged files were also indicative of child pornography.

79. The final browse occurred on August 27, 2019 at 12:13:21 (GMT -06:00).  The computer at the suspect IP address reported that it was running ED2K software with GUID B4F9BED679EF574BAF7BBE623EFE6D16.  The computer again reported its IP address as the suspect IP address and it was operating on port 6346.  During this browse it was noted that a listing of 1536 files were received from that computer and that 436 of those files flagged as child notable. The filenames of most of those flagged files were also indicative of child pornography.

80. The suspect IP address specifically distributed to your Affiant from August 15, 2019 to August 27, 2019 completed downloads of eleven (11) files that were flagged as child notable. A review of three of the files as follows:

81. The download of this file was started on August 15, 2019 at 15:45:47 (GMT -0:600) and was

completed at 15:54:31 (GMT -0:600)
Hash = ED2K:  F071545994E8F1ABF6141FBB27260F56
File Size:  52 MB
Name:  Falkovideo Falko 01 (Recoded For Mobilephone).avi
Description: The video depicts a prepubescent female wearing black stockings and an adult female, who is also wearing black stockings, inserting a vibrator into the child's anus while the child watches what appears to be pornography on a computer monitor.  The child is made to insert the vibrator into the adult female's vagina.  The child is now without the stockings and the adult female is wearing yellow shoes.  The child is made to insert her hand and a vibrator into the adult female's vagina.  An adult male's exposed penis is shown to the camera.  The adult female touches the child's vagina and chest.  A vibrator is placed against the child's vagina.  The adult female inserts her thumb and a sex toy into the child's anus.  The child is again in black stockings and her hands are bound in front of her with handcuffs.  A nude adult male is seated behind her and fondles her vagina.  The adult male inserts his finger into the child's vagina.  The male exposes and fondles his penis to the camera.  The adult female fondles her vagina. The nude child is shown sitting next to the adult female as the adult male inserts his penis into the adult female's vagina.  The words "To be continued" appear on the screen and the video ends.

82. The download of this file was started on August 23, 2019 at 12:34:49 (GMT -0:600) and was completed at 12:36:14 (GMT -0:600)
    Hash = Sha1:  Q4CE2UFU3ZFPLCKHJRLV42YHK5S5WXJX
    File Size:  1.46 MB
    Name:  2009 Dad 5Yo Webcam Sucking Daddy.Pedogirls with dad - 4 yo sucks daddy on webcam.avi
    Description:  The video depicts a female child between the ages of three to five years old being made to put an adult male's penis into her mouth and being made to touch the adult male's penis with her hands.  The male takes the child and places her on his lap with the child's vagina towards the camera and rubs his penis against the child's vagina.  The male takes the child off his lap and once again places his penis in the child's mouth.  The male picks up the child again and places her on his lap with her vagina and anus exposed towards the camera.  The male takes the child off his lap and places his penis into her mouth.

83. The download of this file was started on August 27, 2019 at 17:26:24 (GMT -0:600) and was completed at 17:29:23 (GMT -0:600)
    Hash = Sha1:  D23LUILOATG5KDOHH5R5CVMPP6GV2OWE
    File Size:  20 MB
    Name:  Webcam - horny 11yo Boy jerks & dog licks his dick.avi
    Description:  The video depicts a male between the ages of nine to twelve years old who is seated at the beginning of the video.  The male stands up and sits back down several times during the video and repeatedly exposes and fondles his genitals.  Approximately half way through the video, a dog licks the boy's penis.  After the dog departs, the boy continues to expose and fondle his genitals. The boy exposes his buttocks towards the camera.

85. Your Affiant cross- referenced all three files by hash value against the National Center for Missing and Exploited Children (NCMEC), Law Enforcement Services Portal (LESP) database in order to determine if the files contained previously identified child victims with negative results. Although none of the files contained any identified child victims, that does not mean that the victims in the files are not children; it means that the victims have yet to be identified by law enforcement.

86. In order to identify the Internet Service Provider (ISP) for the suspect IP address, your Affiant queried the American Registry for Internet Numbers which revealed that the suspect IP address was assigned to Comcast Cable Communications.  An administrative summons was served on Comcast Cable Communications requesting subscriber information for the suspect IP address from October 1, 2018 to September 9, 2019.  Comcast Communications provided that the suspect IP address was assigned to David Gurule of 22740 Hope Dale Avenue, Parker, Colorado from March 16, 2019 to September 9, 2019. Your Affiant contacted Comcast Cable Communications telephonically and they advised that they do not retain information longer than 180 days and that is why they were unable to provide subscriber information prior to March 16, 2019. The direct connections, browses and downloads occurred between August 15, 2019 and August 27, 2019.

87. Your Affiant queried CLEAR, an investigative platform with access to public and proprietary records, for the subscriber name provided by Comcast Cable Communications. CLEAR showed a David S. Gurule with a year of birth as 1954 associated with 22740 Hope Dale Avenue, Parker, Colorado. CLEAR also listed an email address of distrodave@comcast.net and telephone number (303) 908-2588 as associated with Gurule.  This same email address and telephone number are also listed as associated with Gurule on the information provided by Comcast Cable Communications.

88. Your Affiant queried the Colorado Crime Information Center (CCIC) for driver's license information for David Gurule.  CCIC records indicate that David Stephen Gurule registered with the address 22740 Hope Dale Avenue, Parker, Colorado.  There is also a David Nathanial Gurule registered at that same address with a year of birth of 1980.

90. On September 10, 2019, HSI SA Vanessa Diaz conducted a surveillance of 22740 Hope Dale Avenue in Parker, Colorado to determine wireless networks in the area.  During this time, several secured wireless networks and one unsecured wireless network were noted. The unsecured network was identified as "xfinitywifi."  SA Diaz attempted to connect to "xfinitywifi" with a mobile device and received the following message: "Unable to join the network "xfinitywifi."" SA Diaz obtained the IP address for the unsecured network "xfinitywifi" of 169.254.16.119, which is different from the suspect IP address. Regardless, based on my training and experience, because SA Diaz was unable to join that unsecure network, I do not believe that it was truly unsecure or open to the public.  SA Diaz provided screenshots of the above-mentioned wireless network survey to your Affiant.

## INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN AND CREATE, POSSESS, RECEIVE AND/OR DISTRIBUTE CHILD PORNOGRAPHY

91. Based on my previous training and experience related to investigations involving child pornography and the sexual abuse of children, I have learned that individuals who create, possess, receive, distribute or access with intent to view child pornography have a sexual interest in children and in images of children.  Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

A. The majority of individuals who create and collect child pornography are persons who have a sexual attraction to children.  They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

B.  The majority of individuals who create and collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification.  The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children. Non-pornographic, seemingly innocuous images of minors are often found on computers and digital storage devices that also contain child pornography, or that is used to communicate with others about sexual activity or interest in children.  Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant.  In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

C.  The majority of individuals who create and collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.  They almost always maintain their collections in the privacy and security of their homes, cars, garages, sheds, and other secure storage locations, such as in a digital or electronic format in a safe, secure, and private environment, including in cloud-based storage online or on their person.

D.  The majority of individuals who create and collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support.  This contact helps these individuals to rationalize and validate their deviant sexual interest and associated behavior.  The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

E.  The majority of individuals who create and collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children, as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires.  Such individuals rarely destroy these materials because of the psychological support they provide.

F.  The majority of individuals who create and collect child pornography often collect, read, copy or maintain names, screen names or nicknames, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests.  These contacts are maintained as a means of personal referral, exchange or commercial profit.  These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

G.  Based upon training and experience, your Affiant knows that persons in engaged in the production and possession of child erotica are also often involved in the production and possession of child pornography.  Likewise, your Affiant knows from training and experience that persons involved in the production and possession of child pornography are often involved in the production and possession of child erotica.

H.  Based on my training, knowledge, experience, and conversations with others in law enforcement, I understand that an individual who possesses images and/or videos depicting child pornography on one digital storage devices and/or Internet email or online storage account is likely to possess child pornography on additional digital storage devices and/or Internet email or online storage accounts that s/he possesses.  Additionally, based on this training and experience, I understand that an individual who discusses the sexual abuse and/or exploitation of children on one digital storage device is likely to conduct those communications on additional digital storage devices that s/he possesses.

## CONCLUSION

92.  Based on the investigation described above, probable cause exists to believe that at the residence located at the place described in Attachment A, will be found evidence, fruits, and instrumentalities of a violation of Title 18, United States Code, Sections 2252(a)(1), (2), and (4) and 2252A(a)(1), (2), (3), and (5) (described on Attachment B).

93.  I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.


_s/Kristen Draper_

Kristen Draper, Special Agent
Homeland Security Investigations


SUBSCRIBED and SWORN before me this ___3rd___ day of ___Oct.___ 2019

UNITED STATES MAGISTRATE JUDGE


Application for search warrant was reviewed and is submitted by David Tonini, Assistant United States Attorney.